William E. GREENE, Food Distributors, Plaintiff-Appellee,

v.

GENERAL FOODS CORPORATION, a Delaware Corporation, Defendant-Appellant.

No. 74–1484.

United States Court of Appeals, Fifth Circuit.

Aug. 11, 1975.

---

638

Julius F. Parker, Jr., Tallahassee, Fla., Paul C. Warnke, Washington, D. C., for defendant-appellant.

Wilfred C. Varn, E. C. Deeno Kitchen, Ben H. Wilkinson, William VanDercreek, Tallahassee, Fla., for plaintiff-appellee.

Before TUTTLE, WISDOM and GOLDBERG, Circuit Judges.

WISDOM, Circuit Judge:

William E. Greene, the plaintiff-appellee, a sole proprietor doing business as "William E. Greene Distributors", was an independent distributor of products of General Foods Corporation. Under the terms of his distributorship agreement with General Foods, Greene resold Maxwell House Coffee and other General Foods products to large institutional buyers. These institutional accounts are known as Multiple Food Service Accounts (MFSA's). The sales to MFSA's were from stocks of products General Foods had previously sold to Greene. The prices were fixed by General Foods according to a nation-wide price schedule, subject to certain adjustments for the particular MFSA. Sales to other customers are referred to as down-the-street (DTS) sales and these accounts are referred to as DTS accounts.

On September 27, 1971, Greene brought this action under the Sherman Antitrust Act of 1890, § 1,[1] against General Foods Corporation. The complaint alleged that General Foods' MFSA pricing scheme constituted unlawful resale price maintenance in violation of § 1 of the Sherman Act. Greene also alleged that General Foods terminated his distributorship because he had failed to adhere to the MFSA pricing system. He sought to recover both profits allegedly lost before termination because of the enforced resale prices, and projected future profits lost because of the alleged

wrongful termination. The case was submitted to a jury. The jury returned a verdict in favor of Greene in the amount of $75,000. The trial court trebled the damages, as it was required to do under 15 U.S.C. § 15,[2] and awarded attorneys' fees of $70,000. We affirm the judgment of the district court.

I.

The facts in this case are for the most part undisputed, but, as in most antitrust cases, the reviewing court has to consider the facts in detail.

General Foods has annual gross sales in excess of $2 billion, and is the largest processor and marketer of coffee in the United States. It has about 45 percent of the retail coffee market and 10 percent of the institutional coffee market. Greene first became a distributor for the General Foods Corporation in 1947, in Charleston, South Carolina. In 1954, at the request of General Foods, he moved to Tallahassee, Florida, where he purchased a General Foods Distributorship for $22,600. His territory included Tallahassee and a specifically designated area surrounding it. Later, he purchased more territory from an adjacent distributor.

In the contract between Greene and General Foods entered into on August 13, 1958, and in force until the termination of the distributorship on January 5, 1971, General Foods agreed "not to search out in [Greene's] territory any other distributor of . . . coffee and tea products during the term of this agreement so long as [Greene] complies with the terms [of the agreement] and meets [General Foods'] performance requirements." From the record it appears that Greene's distributorship was,

1. 15 U.S.C. § 1:
   Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . .

2. 15 U.S.C. § 15:
   Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

as a practical matter, exclusive within the assigned territory. The agreement between Greene and General Foods did not prohibit his distributing the products of other manufacturers as well, and, before General Foods terminated the agreement, Greene had in fact distributed food products not manufactured by General Foods, particularly coffee marketed by the National Institutional Food Dealers' Association under the label of "NIFDA". The contract with General Foods did provide, however, that Greene was to maintain stocks of those institutional food products manufactured by General Foods for which there was an established market within his territory. He was to warehouse and rotate these stocks, to "aggressively sell" General Foods products to his customers, to maintain and repair coffee-making equipment installed by General Foods on the premises of his customers, and to make emergency deliveries and render other services "conventionally rendered" by distributors. He was to cooperate with General Foods' promotional programs and offers, "handle the servicing" of "Multiple Food Service Accounts", and meet General Foods' credit standards.

The agreement further provided that "[a]ll merchandise delivered hereunder by General Foods to be resold by Distributor shall be billed to Distributor on the basis of price lists attached hereto and made a part of this agreement." Those lists were subject to change without notice. The contract provided for a delivery allowance to be credited to the distributor in certain circumstances, and it referred to further adjustments to be made in the price charged the distributor in accordance with General Foods' "stated Earned Quantity Allowance Policy in effect at the time of billing."

Nowhere in the contract were the terms "Multiple Food Service Account" (MFSA) and "Earned Quantity Allowance" defined. At trial, however, witnesses for General Foods testified that a MFSA was defined as a consumer of institutional foods, particularly coffee, that had two or more operations, the "buying decision" for which was "influenced" at a "central point", that purchased an annual volume of 8,000 pounds of coffee or $8,000 worth of institutional foods, and that would, because of probable future growth, require two or more distribution points in separate geographical areas. It is not clear, however, just what was the nature of the buying decision "influenced" at the "central point" of a MFSA. We infer from the record that the contracts entered into between MFSA's and General Foods were not "requirements" contracts. There was testimony that the MFSA's did not bind themselves to purchase exclusively from General Foods' distributors. They did not bind themselves to purchase any particular quantity of any specific products; in fact, they were not obligated to purchase any General Foods products. No example of such a MFSA contract was entered in evidence. There was testimony, however, that over a period of years some of Greene's ordinary or "down the street" (DTS) accounts had been redesignated as MFSA's by the district sales manager. In at least one instance Greene's coffee-making equipment was removed and replaced with equipment owned by General Foods.

The focus of this case is on the process by which sales were made to the MFSA's within Greene's territory. Greene was free to charge a DTS customer any price he chose—unless the account was directly served by another branch of General Foods. Such sales were written on his own invoice form, and payments were made directly to him. The price that he, in turn, paid to General Foods for his stock of goods was determined by General Foods' national distributor price list, minus the "Growth Opportunity Allowance" on coffee items, which was also determined by General Foods. The allowance that General Foods gave a particular distributor was supposed to allow that distributor adequate markup to compete effectively with other local dis-

tributors and expand his share of the local market.[3]

It is not disputed that Greene owned and held title to all goods he acquired from General Foods. He stored them in his warehouses at his own expense and at his risk of loss. It was from this stock of goods owned by Greene that deliveries were made to satisfy the requirements of the MFSA's within his territory. Though no MFSA contract was introduced at trial, it is evident that such agreements did exist. They purported to confer upon the MFSA the right to purchase General Foods products in such quantities as the purchaser might choose, at prices set by a national MFSA price list promulgated by General Foods, minus the "Earned Quantity Allowance" applicable to the particular MFSA, which was calculated by General Foods periodically on the basis of probable volume of consumption.

There was testimony that Greene accorded his MFSA accounts the same treatment as his DTS accounts in every respect except that of billing. That is, the same solicitation on the part of Greene's sales staff was necessary to procure orders from MFSA's as from DTS accounts, the same promotional and other expenses involved, and the same risks incurred up to the point the goods were actually delivered. If by "sale" we mean all those activities in the distribution process undertaken to procure a definite order for delivery of a specified quantity at a time certain, then the MFSA "sales" were made by Greene's staff.

Greene, however, was not allowed to bill the MFSA's in the same manner as his DTS accounts. Rather, he was provided with a supply of MFSA "formsets," a multiple copy invoice set with one copy each for the MFSA, the distributor, and General Foods. On the face of the invoice, the MFSA was directed to make its payment directly to General

Foods. The invoice also bore a printed guarantee of General Foods that the products described in the invoice comply with all federal pure food laws and were properly branded, and that they otherwise could lawfully move in interstate commerce. Greene's sole proprietorship was merely designated by the words "delivered by Wm. E. Greene Food Distributors." Greene was obliged to complete these formsets in MFSA transactions in accordance with General Foods' national MFSA price list and the Equal Quantity Allowance applicable to the particular MFSA. He received a "delivery allowance" that varied with the size of the order, and he received the cost of the goods on the invoice or the total price paid by the MFSA (the record is unclear on the point) as a credit against his overall indebtedness to General Foods. There was testimony that Greene could have received cash instead of this credit, but Greene testified that he had never received cash and did not know that it was possible for him to request cash.

It is undisputed that Greene had no role in setting the distributors' prices, the MFSA prices, the Earned Quantity Allowance, or the Growth Opportunity Allowance. Shipments made to MFSA were made out of Greene's regular stock of goods in his warehouse, and there was no segregation of goods destined for MFSA's. After delivery of the goods to the MFSA, General Foods assumed the risk of default on credit sales and was responsible for the collection of the accounts receivable generated in this fashion. With respect to certain MFSA's, however, it directed the distributor to make deliveries only on a C.O.D. basis.

There was testimony that the number of MFSA's had increased substantially in the ten years preceding trial. The bulk of these MFSA's were served by independent distributors such as Greene, for, although there was a trend in large met-

---

**3.** We should note in this connection that there was some evidence in the record suggesting that General Foods did monitor the prices Greene charged his DTS accounts, presumably to assure itself that Growth Opportunity Allowance was being properly utilized by the distributor. *See* note 5 *infra* & accompanying text.

ropolitan areas for General Foods to undertake the distribution itself, General Foods was unhappy with that trend and preferred to use independent distributors. Experience had shown that the expense of distribution was lower when undertaken by independents, and General Foods preferred not to extend what it characterized as its relatively generous scale of salaries and fringe benefits into the distribution level.[4] In any event, it is clear that the distributor serves a vital function in General Foods' manufacture and sale of institutional food products.

4. General Foods' "Growth Opportunity Manual" dated November 30, 1967, introduced into evidence by the plaintiff, contains the following relevant observations:

General Foods' interest in the institutional coffee business started over twenty years ago. At that time the [institutional coffee] was handled by the General Foods sales force and the Maxwell House division. In 1954 it became the responsibility of [the institutional food service division of General Foods]. During these years over 250 distributors were set up to distribute hotel and restaurant blends to the institutional trade. Market penetration has increased to a current level of approximately 8.0 percent, which when examined on a rural/urban basis, indicates a substantially stronger franchise in the former. This is supported by the following estimated shares: rural market share—14.0 percent; metropolitan market share—3.0 percent.

The penetration problem in the metropolitan markets led to the establishment of a company-owned distribution system in 1962. The need for the company-owned distributor was brought about in large part due to the need for well-financed distributors to compete effectively in the top twenty-five major cities. These branches are operated on a breakeven basis in terms of distribution margins. . . .

The distribution capability of the division is, in large degree, centered in two hundred and eighteen independent distributors. These distributorships are located, for the most part in secondary markets. . . .

. . . . .

Historically, penetration of [the top twenty-five urban markets] with independent distributors has proven to be less than adequate—a static share of less than 2 percent. Our analysis of this important market segment has yielded the conclusion that the major factor in the marginal performance of independent distributors has been strong competitive pressures by institutional coffee suppliers operating their own distribution fa-

For example, coffee for home consumption is packaged so that it has a shelf life of twelve months, but coffee for institutional consumption has a much shorter life since it is not vacuum packed and ideally should be rotated weekly by the distributor. Moreover, the distributor is responsible for maintaining coffee-making equipment installed on the premises of many of the institutional consumers.

The record is ambiguous as to the character of those accounts designated

cilities and satisfied with a manufacturing profit only.

In Fiscal 1962 [the institutional food services division of General Foods] instituted a program to determine the feasibility of direct distribution to the food service industry [in the twenty-five major urban markets]. Based upon results of this and other tests, direct distribution facilities now exist in eighteen of the major metropolitan markets throughout the United States; our current plan is to open two additional branches in Fiscal year 1968 and two more branches in Fiscal 1969, thus bringing to a total of twenty-two the markets serviced by GF direct distribution facilities. . . .

The testimony summarized in the text is in accord with more general conclusions drawn by academic observers of problems in distribution. See, e. g., Comanor, Vertical Territorial and Customer Restrictions: White Motor and Its Aftermath, 81 Harv.L.Rev. 1419, 1436 n. 32 (1968):

In the petroleum industry, for example, a recent study found that the franchise system is a far more efficient method of distribution than direct ownership. Salaried managers are subject generally to limitations on the hours a week they can work and also are more prone to the organizational efforts of labor unions. An independent dealer, on the other hand, is not subject to these limitations. A station which is open from 8:00 A.M. until 6:00 P.M., six or even seven days a week is expensive to operate if employees stop work at the end of forty or forty-eight hours. The average work week for independent dealers tends to approach seventy hours. It is not surprising, therefore, that operating costs of stations owned by the major oil companies are estimated to be about one cent per gallon of gasoline greater than for leased stations. Miller, Exclusive Dealing in the Petroleum Industry: The Refiner Lessee Dealer Relationship, 3 Yale Econ. Essays 223, 232 (1963).

See also Holton, Anti-Trust Policy and Small Business, in Perspectives on Anti-Trust Policy (A. Phillips ed. 1965) 189, 195–200.

by General Foods as MFSA's. As we have said, we do not know the precise nature of the contract entered into between General Foods and the MFSA. We do know that such buyers as the Holiday Inn chain are categorized as MFSA's, but it also appears that the category is broad enough to include much smaller buyers, some with as few as two outlets. Witnesses for General Foods stated that there were some MFSA's whose buying decisions were made only on a local level, and that there are some MFSA's on the local level that purchase less General Foods products than local non-MFSA accounts. Moreover, there are some accounts designated MFSA's that do not buy General Foods products at all: they have the right to purchase as MFSA's, but do not exercise it. General Foods had redesignated some of Greene's DTS accounts as MFSA's. As will appear in greater detail below, Greene's margin of profit on the MFSA sales was about 10 percent; he testified that he charged higher prices on the DTS accounts than he otherwise would have to maintain a suitable overall level of profit in his business.

The Growth Opportunity Allowance granted by General Foods to each distributor was, in the view of General Foods' witnesses, designed to enable the distributor to set his DTS prices at a level to meet local competition and yet maintain a suitable overall profit margin for his business. This allowance was developed, according to General Foods, because many markets are "dominated" by "local" coffee roasters. The Growth Opportunity Allowance therefore was not as sensitive to volume as the Earned Quantity Allowance was but rather reflected the local competitive situation.

General Foods asserts that market conditions dictated its policy with respect to MFSA's. These buyers, it says, tend to make more centralized buying decisions. To allow it to compete effectively with other large national coffee roasters, many of which distribute directly through company distributorships, General Foods established the MFSA system

so that it could negotiate directly with these buyers. The subject of the negotiation appears to be not the prices on the MFSA price list themselves, but rather the individual Earned Quantity Allowance applicable to the particular MFSA. Even here, however, the record is ambiguous, because General Foods' witnesses testified that there existed a schedule of suggested Earned Quantity Allowances graduated according to probable annual volume, freight, expense of installing and maintaining equipment on the premises of the MFSA. These facts do not suggest the open-ended price negotiation General Foods advances as a justification for its MFSA system.

Moreover, Greene's principal salesman testified that, in his experience, those accounts in his territory designated as MFSA's could be sold the same merchandise at DTS prices, which were higher than MFSA prices, either on the MFSA ticket or on Greene's own ticket without a material decrease in sales volume. Although General Foods brought no pressure to bear upon Greene with respect to his pricing to DTS accounts, it did monitor the pricing on both his MFSA and DTS accounts. On those occasions when he attempted to sell to MFSA's at a higher price, he was directed to adhere to the MFSA formula, and did so. According to Greene's witnesses, then, a higher profit margin on sales to MFSA's could be obtained if Greene were not obliged to adhere to the MFSA price list and the Earned Quantity Allowance calculated for each account, and this would make possible a reduction in the margin that had to be maintained with respect to DTS accounts.

The agreement between Greene and General Foods provided that "in the event . . . of the failure of Distributor to perform any one or more of Distributor's obligations under this agreement, General Foods shall have the right to terminate the term hereof upon giving the Distributor not less than five days' written notice of its intention so to do." Greene was notified on December 31, 1970, of General Foods' election to

terminate his distributorship effective January 5, 1971. There is, of course, conflict in the testimony regarding General Foods' motive in terminating the distributorship. For about a year prior to termination, Greene had been negotiating with General Foods in an effort to sell his distributorship to it. Some time after Greene first mentioned his dissatisfaction with the low profit margin on MFSA sales to him, the district sales manager reduced his Growth Opportunity Allowance for DTS accounts on the ground that his sales trends "have been on the down swing for some time," and that his distributorship "simply has not been growing.[5]"

Business records of General Foods obtained in discovery and introduced by the plaintiff show that it was about this time that General Foods became concerned about Greene's promotion of food products of other manufacturers. Eventually this concern led to an investigation of his business to determine whether Greene was a "defector." This term was never clearly defined at trial but apparently it signified a distributor whose interest in other aspects of his business outweighed, in the opinion of General Foods, his interest in distributing its products. The record does establish that at several points before the termination, and as late as two days before notice of termination was sent, Greene received assurances from General Foods that it was in the process of evaluating his business with a view to making him an offer to purchase it. It was on the basis of these assurances that Greene permitted General Foods' personnel to make an exhaustive examination and analysis of his books of account and other business records. There is, as we noted, testimony that he sold merchandise to MFSA's at other than MFSA prices, and was directed not to continue the practice. He had become active in distributing a competing brand of coffee under the NIFDA (National Institutional Food Dealers Association) label, and admitted that he sold some of this brand to some of the MFSA accounts.

General Foods maintains that it terminated the distributorship because Greene sometimes lied to his MFSA's in telling them that the General Foods products they wished to order were out of stock and informing them that the only products he could provide them with were NIFDA. Greene denies this, and his chief salesman testified that NIFDA products were offered to MFSA's only as alternatives to General Foods products, not on a take-it-or-leave-it basis, and were delivered only on order of the MFSA. Nothing in his distributorship agreement forbade Greene from dealing in the products of other manufacturers, and he testified that the reason he began

---

5. It appears from the pre-trial stipulation and certain of the rulings made during the course of the trial that Greene based his claim under § 1 of the Sherman Act in part upon this reduction of his Growth Opportunity Allowance (GOA). The parties listed as one of the contested issues of fact "whether Greene received a GOA on coffee items which was less than other distributors because Greene did not use such allowance in pricing his coffee sales to non-MFSA accounts". Greene apparently credited the GOA against his general cost of doing business, and did not calibrate his prices to DTS accounts in accordance with the GOA received. When Greene's counsel attempted to explore this matter at trial, the court would not allow testimony on the issue or submission of the question to the jury on the ground that it was undisputed that Greene had not let the GOA affect his DTS pricing. The parties have not challenged this ruling as error, and it is not, properly speaking, before this Court.

Lest our affirmance of the district court's judgment be taken to imply approval of this ruling, however, we disclaim any such intent. In fact, although it is of course difficult to assess the GOA system on the basis of the present record, the system appears to resemble the TCA system this Court examined at length in Lehrman v. Gulf Oil Corp., 5 Cir. 1972, 464 F.2d 26, 37–41. We held there:

A supplier need not grant any wholesale price support to his retailers, whether it calls that price support a 'temporary competitive allowance' or attaches some other label to the concession. But if the supplier does grant price support, and if price support is as crucial to the retailer's success as it is to a gasoline retailer's, the supplier cannot withdraw or substantially reduce price support simply because a retailer chooses to reduce his gross margin of profit and sell the product at retail for less than the supplier suggested, expected, or desired.

dealing in NIFDA products was that he could obtain a substantially higher mark-up on their resale. The trial court charged the jury that if it believed that Greene had done as General Foods contended with respect to sales of NIFDA products to MFSA's, he would not be entitled to any damages for loss of future profits.

After termination of the distributorship on January 5, 1971, Greene's business suffered a substantial decline. General Foods itself undertook to distribute its products in the territory formerly covered by Greene, and so competed directly with him for sales to both MFSA and DTS account consumers of institutional food products.

## II.

■ We consider first whether Greene should be estopped from asserting his cause of action on the ground of his participation in General Foods' marketing activities or by some variant of the equitable doctrine of *in pari delicto*.[6] In its brief, General Foods offers the following rationale for applying the doctrine of estoppel or of *in pari delicto*:

The record shows irrefutably that Mr. Greene was for the greater part of 17 years both a willing and knowing participant in General Foods' MFSA sales program for large multiple customers and a significant beneficiary of that arrangement. . . . For all of these years, the parties maintained a harmonious and mutually beneficial relationship. . . . We do not claim here that Mr. Greene has "unclean hands". . . . Essentially it is a principle of equitable estoppel. For almost seventeen years, Mr. Greene voluntarily undertook to act as a delivery agent to MFSA accounts of General Foods in the Tallahassee area and to receive compensation in the form of delivery charge. Until he decided to

sell his business and filed this suit, he never complained of this role. He cheerfully accepted both it and the profits he earned through delivery fees on sales which General Foods had negotiated.

In support of this equitable argument, General Foods makes several assertions of fact. These are either not borne out by the evidence or are contradicted by evidence offered by the plaintiff. For example, General Foods asserts that "in the absence of these [MFSA] arrangements, . . . large institutional accounts would still have purchased directly either from General Foods or some other coffee producer without any participation or profit for Mr. Greene", although it offered no proof for this contention. But Greene performed promotional and selling services to MFSA's in his territory. Moreover, Greene testified that some of his DTS accounts were redesignated as MFSA's, and he was obliged to sell to them on the MFSA schedule. Again, General Foods asserts that Greene "could, at his regular [DTS] high prices, have sought to make [the MFSA's] his own customers with the promise of preferred service or other inducements. Legally and contractually, he was free at all times to sell from his own stock at prices within his sole determination." This assertion is contradicted by testimony at trial that when Greene sought to sell MFSA's on his own ticket and at his own prices, he was directed to adhere to the MFSA procedure and MFSA prices established by General Foods. And General Foods asserts that if it is not permitted to retain control over its MFSA prices, its alternatives would be to "establish branch warehouses to service these accounts, with the consequent elimination of the distributor's delivery charge on such sales and eventually his complete elimination from the picture, or . . . forfeit the

6. For general discussions of the *in pari delicto* doctrine, *see* Handler, Through the Antitrust Looking Glass—21st Annual Antitrust Review, 57 Calif.L.Rev. 182 (1969); Note, *In Pari Delicto* Consent as Defenses in Private Antitrust Suits, 78 Harv.L.Rev. 1241 (1965); Note, Unclean Hands: The Effect of Plaintiff's Antitrust Violations in Antitrust Actions, 113 U.Pa.L. Rev. 1071 (1965).

business to its direct selling competitors." There is nothing in the record to support these assertions; in fact, there is contradictory evidence offered by Greene to the effect that his profit margin was not high enough on the MFSA phase of his business and that he therefore had to charge his DTS customers higher prices.

█ It is clear, however, that Greene knowingly participated in the MFSA program. That he was a "willing" participant is less clear, for he testified that it was only after he moved to Tallahassee at General Foods' request and undertook distribution of their products there that the MFSA program began, and that gradually the number of MFSA's was increased and some of his original DTS accounts were redesignated MFSA's. In any event, the degree of profitability or its lack resulting from an alleged antitrust violation should play no part in the determination whether the plaintiff's suit should be barred on equitable grounds. Such considerations, when proper at all, are at best relevant only to the quantum of damages recoverable.

The leading case on the availability of equitable defenses in private treble damages antitrust actions is Perma Life Mufflers, Inc. v. International Parts Corp., 1968, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982. Mr. Justice Black in unequivocal language stated in his opinion for the Court:

> . . . we cannot accept the . . . idea that courts have power to undermine the antitrust acts by denying recovery to injured parties merely because they have participated to the extent of utilizing illegal arrangements formulated and carried out by others. Although petitioners may be subject to some criticism for having taken any part in respondents' allegedly illegal scheme and for eagerly seeking more franchises and more profits, their participation was not voluntary in any meaningful sense. . . Petitioners apparently accepted many of these restraints solely because their acquiescence was necessary to obtain an otherwise attractive business oppor-

tunity. . . . We therefore hold that the doctrine of in pari delicto, with its complex scope, contents and effects, is not to be recognized as a defense to an antitrust action. . . We need not decide, however, whether . . . truly complete involvement and participation in a monopolistic scheme could ever be a basis, wholly apart from the idea of pari delicto, for barring a plaintiff's cause of action
. . . . .

392 U.S. at 139–40, 88 S.Ct. at 1984. There are five opinions in that case, but a majority of the Court would not allow the defense when the defendant thrust the antitrust violation upon the plaintiff. *Perma Life* was a private action against manufacturers of automobile "Midas" mufflers and exhaust system parts by plaintiffs who had entered into dealership sales contracts. Two of the challenged provisions of the contracts were clearly contrary to the self-interest of the plaintiffs and these provisions, taken together with other evidence in the record, compelled the conclusion that "the illegal scheme was thrust upon [the plaintiffs] by the [defendant]". 392 U.S. at 141, 88 S.Ct. at 1986.

We have no occasion here to consider to what extent the "in pari delicto" doctrine will continue to function in private antitrust litigation, if indeed the plaintiff is equally responsible, or a co-adventurer. Here the plaintiff is representative of the small businessman who acquiesces in or is coerced into a program or pattern of conduct violative of the antitrust laws because of the disproportionate bargaining power of the corporation from which he obtains most of his stock in trade. The record suggests that Greene was obliged to service a growing number of accounts redesignated by General Foods as MFSA's over the years of his distributorship at a modest "delivery charge" that would not cover his overhead and that necessitated his charging higher prices to his ordinary customers. Even if we accept General Foods' argument that *in pari delicto* and closely related equitable defenses such as

consent and unclean hands are still viable after *Perma Life*—an argument we seriously question—the record shows a great disparity between the plaintiff and the defendant both in terms of responsibility for establishing the system alleged to violate the antitrust laws and the benefits conferred by that system. In these respects, the facts before us bear a significant resemblance to the facts in Simpson v. Union Oil Co., 1964, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98, which is also important in relation to another aspect of this case. There, a gasoline service station lessee alleged that his lessor, Union Oil, refused to renew his lease because he had sold gasoline Union Oil "consigned" to him at less than the price fixed in the "consignment" agreement between them. The Court held the consignment agreement and the price structure it made possible violated the antitrust laws. There was no suggestion in *Simpson* that the plaintiff should be barred by *in pari delicto* because he undertook the lease in the first place and for a time participated in the resale price maintenance scheme.

The plaintiff in the present case cannot be distinguished from the plaintiff in *Simpson*. Each operated his business as a sole proprietor; each had nothing to do with the creation of the arrangement alleged to violate the antitrust laws nor with the fixing of the prices that the arrangements made possible; each had economic bargaining power greatly inferior to that of the corporation with which he dealt. It is true that Greene did business with the defendant for a much longer period of time than the plaintiff in *Simpson,* but the MFSA system itself grew up over a period of several years, while the consignment system in *Simpson* existed from the outset of the plaintiff's relationship with the defendant there. On the authority of *Simpson* and *Perma Life* and the strong policy they embody, we cannot allow the interposition of a doctrine, which developed in other contexts, to thwart the enforcement of the antitrust laws. Accordingly, we reject the suggestion that the plaintiff should be barred from suing General Foods in this case. It was an overmatch, not "compensated dishonor among thieves". *Perma Life,* 392 U.S. at 154, 88 S.Ct. 1981. (Harlan, J., dissenting).

## III.

We turn now to the question whether General Foods' MFSA system violated § 1 of the Sherman Act. No rule under that "charter of liberty" [7] is more firmly established than the ban on price-fixing. A review of the decisional law shows a steady development in the direction of protecting small businessmen and consumers from sophisticated methods of resale price maintenance.

It is a long story; we begin at the beginning. In United States v. Addyston Pipe & Steel Co., 6 Cir. 1898, 85 F. 271, *aff'd,* 1899, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136, a number of companies manufacturing iron pipe formed a combination to divide their territories into cities that were designated the exclusive domain of one or another of the manufacturers. The remaining territory was governed by an agreement whereby all offers to purchase pipe were submitted to a committee which set the price and awarded the contract to the manufacturer that agreed to pay the largest bonus to be divided among the others. After an exhaustive review of the common law authorities, Judge (later Chief Justice) Taft concluded:

> We can have no doubt that the association of the defendants, however reasonable the prices they fixed, however great the competition they had to encounter, and however great the necessity for curbing themselves by joint agreement from committing financial

---

7.  21 Cong.Rec. 2461 (1890) (Senator Sherman); Sugar Institute, Inc. v. United States, 1936, 297 U.S. 553, 600, 56 S.Ct. 629, 642, 80 L.Ed. 859, 877: "The Sherman Act, as a char- ter of freedom, has a generality and adaptability comparable to that found to be desirable in constitutional provisions." (Hughes, C. J.).

suicide by ill-advised competition, was void at common law, because in restraint of trade, and tending to a monopoly.

85 F. at 291. The court found it unnecessary, however, to rely upon the common law, and the possible defense it offered for price-fixing that was "reasonable" and merely ancillary to otherwise lawful conduct, for it found that "no matter what the excuse for the combination by defendants in restraint of trade, the illegality of the means stamps it as a conspiracy, and so brings it within that term of the federal statute." 85 F. at 294.

■ *Addyston* laid the foundation for the principle that price-fixing among competitors is a per se violation of the Sherman Act. United States v. Trenton Potteries Co., 1927, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, further developed the rationale for such a rule. There, the United States obtained an indictment of numerous individuals and 23 corporations charging that they had formed a combination to fix uniform prices for the sale of sanitary pottery and that they had also combined to limit the sale of pottery to a special group of "legitimate jobbers". The Court rejected the contention that the rule of reason applied to the price-fixing arrangement:

> The aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition. The power to fix prices, whether reasonably exercised or not, involves power to control the market and to fix arbitrary and unreasonable prices. The reasonable price fixed today may through economic and business changes become the unreasonable price of to-morrow.

273 U.S. at 397–98, 47 S.Ct. at 379.

Later, in United States v. Socony-Vacuum Oil Company, 1940, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129, the Court considered a complex arrangement by which the excess gasoline produced by independent refiners was allocated among them for purchase by the defendant oil companies with a view to eliminating this "distress" gasoline as a market factor in the "spot market price" for gasoline. The Court upheld the convictions. "[U]nder the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se." 310 U.S. at 223, 60 S.Ct. at 844. The Court observed that the mechanism by which the fixing of prices was effectuated was immaterial, as was the reasonableness of particular prices fixed. And, the Court said, the ban on combinations to control prices extended beyond a combination that enjoyed a strategic position in the market. "Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces." 310 U.S. at 221, 60 S.Ct. at 843.

*Addyston, Trenton Potteries,* and *Socony-Vacuum,* dealing with *horizontal* combinations among competitors to affect the pricing of their commodities, reflect a deep concern with preserving the free play of market forces with respect to pricing at each level of the distributive process. Even before the *Trenton Potteries* and *Socony-Vacuum* cases were decided, the Court had considered the problem of *vertical* price-fixing. In Dr. Miles Medical Company v. John D. Park & Sons Company, 1911, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502, the Court granted certiorari to review the dismissal, for want of equity, of a bill to restrain the defendant Park & Sons from inducing agents of the plaintiff Dr. Miles and those who purchased from the plaintiff from breaking their contracts not to sell the plaintiff's goods below a fixed price. The defendant, a wholesale drug company, had refused to enter into Dr. Miles' wholesale consignment contract or retail agency contract. Instead, it sought to procure Dr. Miles' medicines for sale at "cut prices" from purchasers who had entered into the wholesale consignment

contract or the retail agency contract at prices lower than those specified in the contracts. The Court said that the plaintiff had no greater claim to control over the resale price of his product on account of the "secret process" by which it was manufactured than had any other manufacturer of an unpatented article. It conceded that the manufacturer was not bound to make the product or to sell it to any particular firm or individual. But it did not follow, the Court reasoned, that the manufacturer might therefore impose every sort of restriction upon his purchaser. For one thing, ancient common law had ordinarily forbidden a general restraint upon alienation. See 2 Coke on Littleton § 360. Concluding that the primary benefit of resale price maintenance accrues to the retailer, and not to the manufacturer, the Court continued:

If there be an advantage to the manufacturer in the maintenance of fixed retail prices, the question remains whether it is one which he is entitled to secure by agreements restricting the freedom of trade on the part of dealers who own what they sell.

. . . . .

. . . And where commodities have passed into the channels of trade and are owned by dealers, the validity of agreements to prevent competition and to maintain prices is not to be determined by the circumstance of whether they were produced by several manufacturers or by one, or whether they were previously owned by one or by many. The [plaintiff] having sold its product at prices satisfactory to itself, the public is entitled to whatever advantage may be derived from competition in the subsequent traffic.

220 U.S. at 407–08, 31 S.Ct. at 384.

In dissent, Mr. Justice Holmes foreshadowed much of the later development of the ban on resale price maintenance. He observed that the plaintiff presumably could have lawfully achieved the same result the Court had just held vio-

lative of the Sherman Act "If it should make the retail dealers also agents in law as well as in name, and retain the title until the goods left their hands". 220 U.S. at 411, 31 S.Ct. at 386. In addition to Justice Holmes's suggestion, it might have been argued that the Court also left open the question of the legality of resale price maintenance without the explicit contracts that were involved in Dr. Miles. And, indeed, in two later cases the Court appeared to sanction these more limited means of controlling resale prices. In United States v. Colgate & Co., 1919, 250 U.S. 300, 39 S.Ct. 465, 468, 63 L.Ed. 992, 997, the Court held:

In the absence of any purpose to create or maintain a monopoly, the [Sherman] act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance circumstances under which he will refuse to sell.

The right to refuse to deal might thus be viewed as an adjunct to the right of a purely private enterprise to dispose of its property as it sees fit—a right necessarily implied by the institution of private property. This right, however, was substantially limited later.

The hypothetical case Mr. Justice Holmes had suggested in Dr. Miles materialized in United States v. General Electric Company, 1926, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362. There, the United States sought to enjoin General Electric Company, Westinghouse Electric & Manufacturing Company, and Westinghouse Lamp Company from alleged violations of the Sherman Act incurred by their system of distribution. As to the consignment aspect of the case, the Court held:

There is nothing as a matter of principle or in the authorities which requires us to hold that genuine contracts of agency like those before us, however comprehensive as a mass or

whole in their effect, are violations of the Anti-Trust Act. The owner of an article patented or otherwise is not violating the common law or the Anti-Trust Law by seeking to dispose of his articles directly to the consumer and fixing the price by which his agents transfer the title from him directly to such consumer.

272 U.S. at 488, 47 S.Ct. at 196. The Court distinguished *Dr. Miles* on the ground that the articles involved in that case had been sold at full price, and that the retailers were the "complete owners" of the articles. *Id.*[8]

If vertically imposed controls upon pricing found limited support in *Colgate* and *General Electric*, horizontal schemes, as we noted, soon became subject to per se condemnation in *Trenton Potteries*, decided the year after *General Electric*, and in *Socony-Vacuum*. The Court never offered a rationale for the difference in treatment between a situation where a horizontal combination, even though lacking in monopoly power, attempts to control prices, and where a single firm enjoying a substantial share of the market, as in *General Electric*, seeks to control the resale price of the articles in question.[9] It is not surprising, then, that

8. Of course, the same is true of the General Foods products sold to Greene in the present case.

9. Others, however, have sought to justify a distinction between horizontal price fixing and vertical controls on price. Professor Bork has attempted to justify not only vertically imposed controls on price (resale price maintenance), but also other vertically imposed restraints, such as restrictions on territories and customers. *See* Bork, The Rule of Reason and the Per Se Concept: Price Fixing and Market Division I, 74 Yale L.J. 775 (1965); The Rule of Reason and the Per Se Concept: Price Fixing and Market Division II, 75 Yale L.J. 373 (1966). Professors Gould and Yamey took up Bork's challenge, and the following dialogue ensued: Gould & Yamey, Professor Bork on Vertical Price Fixing, 76 Yale L.J. 722 (1967); Bork, A Reply to Professors Gould & Yamey, 76 Yale L.J. 731 (1967); Gould & Yamey, Professor Bork on Vertical Price Fixing: A Rejoinder, 77 Yale L.J. 936 (1968); Bork, Resale Price Maintenance and Consumer Welfare, 77 Yale L.J. 950 (1968). Bork undertook to demonstrate that in the absence of reseller's cartels or manufacturer's cartels, it could confidently be assumed that no manufacturer would institute a program of resale price maintenance with the objective or the effect of restricting output. Nor would a system of resale price maintenance be instituted to give resellers a "greater-than-competitive return". "The manufacturer who imposes [resale price maintenance] . . . must be attempting to purchase something for it. What he gets is usually increased activity by the reseller in providing information, promotional services, and the like. These are means of increasing distributive efficiency and should be permitted on grounds of efficient resource allocation. The case is no different than if the manufacturer owned the resellers and required his reseller employees to perform the same functions. [Resale price maintenance] is simply a partial integration and is often more efficient than full integration by ownership or contract." Bork, 75 Yale L.J. at 731 (1967). This is not the place to attempt to refute this argument, except to note that, in addition to Professors Gould & Yamey, a number of other commentators have taken a contrary view. *See, e.g.*, Comanor, Vertical Territorial and Customary Restrictions: White Motor and Its Aftermath, 81 Harv.L.Rev. 1419 (1968); Blake & Jones, Toward a Three-Dimensional Antitrust Policy, 65 Colum.L.Rev. 422, 432–33 (1965); Kaysen & Turner, Antitrust Policy: An Economic and Legal Analysis (1959) 213 ("Granted that complete removal of resale price maintenance, which has already been shredded by adverse court decisions in many states, would mean some reduction in the opportunities for profitable small business operations, we simply take the view that such a loss is not comparable to the gains to the economy and consumers generally from free competition in distribution."). *Compare* Levi, The Parke Davis-Colgate Doctrine: The Ban on Resale Price Maintenance, 1960 S.Ct.Rev. 258, 326: "As far as social policy is concerned, it would not be earthshaking, whichever direction the common law of anti-trust took with regard to resale price fixing." For other treatments of the problem of resale price maintenance *see* L. B. Schwartz, Free Enterprise and Economic Organization: Antitrust and Regulatory Controls (4th ed. 1972) 962–80; Elman, "Petrified Opinions" and Competitive Realities, 66 Colum.L.Rev. 625 (1966); Preston, Restrictive Distribution Arrangements: Economic Analysis and Public Policy Standards, 30 L. & Contemp.Problems 506 (1965); Posner, Antitrust Policy and the Supreme Court: An Analysis of the Restricted Distribution, Horizontal Merger and Potential Competition Decisions, 75 Colum.L.Rev. 282, 283–299 (1975); Lowry, Legality of Price Advice as a Resale Price Maintenance Technique, 29 Ohio St.L.J. 9 (1968); McLaren, Marketing Limitations on In-

both *Colgate* and *General Electric* were subsequently virtually limited to their facts.

The ambit of *Colgate* was severely limited in United States v. Parke, Davis & Co., 1960, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505. There, the Court found that Parke, Davis had gone beyond simple refusal to deal sanctioned by *Colgate.* "Instead Parke, Davis used the refusal ·to deal with the wholesalers in order to elicit their willingness to deny Parke, Davis products to retailers and thereby help gain the retailers' adherence to its suggested minimum retail prices." The wholesalers cooperated with Parke, Davis by cutting off supplies to retailers whose names had been supplied them by Parke, Davis. This, the Court said, created a conbination in violation of the Sherman Act.[10] *See also* Albrecht v. Herald Co., 1968, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998.

■ Four years later, the Court decided Simpson v. Union Oil Co. of California, 1964, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98.[11] The plaintiff in *Simpson* was a year to year lessee of one of Union Oil's retail outlets. Union Oil re-

quired him to sign a "consignment" agreement as well, under which title to the consigned gasoline remained in the name of the consignor, Union Oil, and the retail price of the gasoline was set by Union Oil. Union Oil paid the property taxes, but the lessee station operator was liable for all personal liability and property damage incurred on account of the consigned gasoline, and for all losses of gasoline except those caused by "acts of God". The Court declined to elevate the form of the agreement over its substance: "If the 'consignment' agreement achieves resale price maintenance in violation of the Sherman Act, it and the lease are being used to injure interstate commerce by depriving independent dealers of the exercise of free judgment whether to become consignees at all, or remain consignees, and, in any event, to sell at competitive prices." 377 U.S. at 16, 84 S.Ct. at 1054. In reaching this result, the Court relied in part on the close scrutiny Congress had given the problem of resale price maintenance, and the narrow ambit within which Congress had legitimated it, in the McGuire Act, 15 U.S.C. § 45, and the Miller-Tydings Act, 15 U.S.C. § 1.[12] The Court relied, impor-

dependent Distributors and Dealers—Prices, Territories, Customers, and Handling of Competitive Products, 13 Antitrust Bull. 161 (1968); Rahl, *Price Competition and the Price Fixing Rule,* Heath, *The Per Se Rule in the Light of British Experience,* Shniderman, *The Impact of the Robinson-Patman Act on Pricing Flexibility,* Heflebower, *Do Administered Prices Involve an Antitrust Problem?,* all in symposium on "Price Competition and Antitrust Policy", 57 N.W.U.L.Rev. 137–205 (1962).

**10.** For cases following *Parke Davis, see, e.g.,* Klein v. American Luggage Works, Inc., 3 Cir. 1963, 323 F.2d 787; Lessig v. Tidewater Oil Co., 9 Cir. 1964, 327 F.2d 459; Broussard v. Socony Mobile Oil Co., Inc., 5 Cir. 1965, 350 F.2d 346; Girardi Bearing Co. v. Gates Rubber Co., 9 Cir. 1963, 325 F.2d 196; George W. Warner & Co. v. Black & Decker Mfg. Co., Inc., 2 Cir. 1960, 277 F.2d 787; Ford Motor Co. v. Webster's Auto Sales, Inc., 1 Cir. 1966, 361 F.2d 874; Quinn v. Mobil Oil Co., 1 Cir. 1967, 375 F.2d 273. For cases appearing to find continued vitality in the *Colgate* doctrine, *see* Sandura Co. v. FTC, 6 Cir. 1964, 339 F.2d 847; Brown Shoe Co. v. FTC, 8 Cir. 1964, 339 F.2d

45, *rev'd on other grounds,* 1966, 384 U.S. 316, 86 S.Ct. 1501, 16 L.Ed.2d 587; South End Oil Co. v. Texaco, N.D.Ill.1965, 237 F.Supp. 650; House of Materials, Inc. v. Simplicity Pattern Co., Inc., 2 Cir. 1962, 298 F.2d 867.

**11.** For a perceptive analysis of *Simpson,* see Rahl, Control of an Agent's Prices: The Simpson Case—A Study in Antitrust Analysis, 61 N.W.U.L.Rev. 1 (1966). *See also* Handler, Recent Antitrust Developments—1964, 63 Mich.L.Rev. 59 (1964), Reprinted In M. Handler, Twenty-Five Years of Antitrust (1973), vol. 1, p. 531. For cases following *Simpson, see* Sun Oil Co. v. FTC, 7 Cir. 1965, 350 F.2d 624, *cert. denied,* 1966, 382 U.S. 982, 86 S.Ct. 559, 15 L.Ed.2d 473; Atlantic Refining Co. v. FTC, 6 Cir. 1965, 344 F.2d 599, *cert. denied,* 1965, 382 U.S. 939, 86 S.Ct. 391, 15 L.Ed.2d 350; Guidry v. Continental Oil Co., 5 Cir. 1965, 350 F.2d 342.

**12.** Even the relatively limited channel afforded by these statutes for legal resale price maintenance has for a long time been severely criticized. *See, e.g.,* Kaysen & Turner, Antitrust Policy: An Economic and Legal Analysis (1959) 213. "At latest count, twenty-nine

tantly, on *Parke, Davis* for the proposition "that a supplier may not use coercion on its retail outlets to achieve resale price maintenance". 377 U.S. at 17, 84 S.Ct. at 1054. It added that "it matters not what the coercive device is." *Id.* Presumably, the simple announcement of terms and refusal to deal still allowed under *Colgate* is the only device that can escape this condemnation.

The opinion in *Simpson* did not rest upon the coercive use of the termination provisions of the lease and consignment agreement alleged in the complaint alone. The Court strongly suggested that the overall system of distribution, and not the particular animus allegedly directed against the plaintiff by Union Oil in its exercise of specific termination rights, was what offended the Sherman Act. The Court said:

> When, however, a 'consignment' device is used to cover a vast gasoline distribution system, fixing prices through many retail outlets, the anti-trust laws prevent calling the 'consignment' an agency, for then the end result of United States v. Socony-Vacuum Oil Co. . . . would be avoided merely by clever manipulation of words, not by differences in substance. The present, coercive 'consignment' device, if successful against challenge under the anti-trust laws, furnishes a wooden formula for administering prices on a vast scale.

377 U.S. at 22, 84 S.Ct. at 1057 (footnotes omitted).

In its emphasis of the vastness of the system and the pervasiveness of the price-fixing effectuated thereby, the Court appears to have stopped just short of declaring all devices by which resale price maintenance is accomplished to be violations of the Sherman Act. Certainly, its citation of *Socony-Vacuum* enunciating the modern prohibition of horizontal combinations affecting prices lends support to this view. On the other hand, the fact that the majority in *Simpson* chose to distinguish the *General Electric* case on the narrow ground that the consignment agreements there involved *patented* articles, would suggest that there may still be a limited place for certain sorts of consignment agreements consistent with the Sherman Act.[13]

■ The Court has not had occasion since *Simpson* to define further what lawful scope, if any, the consignment device still has. One strong element in the Court's opinion was its emphasis on the independence, in virtually every respect (save that of pricing), of the local retailers such as the plaintiff in this case. Since virtually all the risks of the retail enterprise were borne by the local retailers, the result is supportable on the ground that it increases their autonomy and at the same time makes possible price competition among themselves. Such price competition on the local level serves to decentralize ultimate control over the price structure within the industry, thus diminishing the opportunity for establishing "administered prices" alluded to in a footnote in the majority's opinion in *Simpson*. 377 U.S. at 22 n. 9, 84 S.Ct. 1051. It has been well noted in this connection that "the Supreme Court seems to be at least as interested in preserving the discretion of the independent dealer, unfettered by manufacturer pres-

states still allow the maker of a product to set retail prices, usually at levels benefiting small retailers and forbidding competitive discounting. However, there's a marked trend among legislators toward repeal of these 'fair trade' laws, and Congress is moving strongly toward sweeping them away everywhere. . . . according to Sen. Edward Brooke . . . a sponsor of the repeal bill, the 'legalized price fixing' permitted by the state laws costs consumers more than $2 billion a year." *Senate Unit Votes To Ban State Laws On 'Fair Trade'*, Wall Street Journal, May 6, 1975, at 4, col. 1.

13. Justice Stewart thought the distinction made by the majority was "specious", and interpreted the opinion as overruling *General Electric* for all practical purposes. 377 U.S. at 27–28, 47 S.Ct. 192 (dissenting opinion). Judge Bryan apparently agreed with Justice Stewart, for he ruled that the same consignment system, coupled with evidence that it was used to facilitate price fixing, constituted a per se violation of the Sherman Act. United States v. General Electric Co., S.D.N.Y.1973, 358 F.Supp. 731.

sure, as it is in avoiding cartel activity at the dealer level." Blake & Jones, Toward a Three-Dimensional Antitrust Policy, 65 Colum.L.Rev. 422, 433 (1965).[14] *Simpson*, even if it did not intend to outlaw all devices whereby resale price maintenance is achieved, must be read to prohibit it where the risks of the distribution process are borne largely by numerous otherwise independent individuals or firms in competition with each other in a product for which there is a widespread demand on the level of the individual consumer.

Two cases decided after *Simpson* lend support to this view. In United States v. Arnold, Schwinn & Co., 1967, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249, the Court held that when a manufacturer sells his products to a distributor and attempts to impose territorial restrictions limiting the area within which, and therefore the customers to whom, those products may be resold, a per se violation of the Sherman Act results.[15] 388 U.S. at 379, 87 S.Ct. 1856. The per se prohibition, however, did not extend to "all vertical restrictions of territory and all franchising, in the sense of designating specified distributors and retailers as the chosen instruments through which the manufacturer, retaining ownership of the goods, will distribute them to the public," because "such a rule might severely hamper smaller enterprises resorting to reasonable methods of meeting the competition of giants and of mer-

chandising through independent dealers, and it might sharply accelerate the trend toward vertical integration of the distribution process." 388 U.S. at 379–380, 87 S.Ct. at 1866.

*Schwinn* was followed by United States v. Topco Assoc., Inc., 1972, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515. The defendant in that case was an association of small and medium-sized supermarket chains. The purpose of the organization was to obtain merchandise under private labels, so that the chains could compete more effectively with larger national chains. The association imposed restraints upon the members which prohibited them from retailing Topco brand merchandise outside the territory in which the particular member was licensed to operate. The Court held these territorial restraints to be per se violations of the Sherman Act, notwithstanding the finding of the district court that intrabrand competition in Topco brand would not be increased if the restraints were dissolved, and, that in fact, the ability of the member chains to compete with the national chains might be diminished.

Albrecht v. Herald Co., 1968, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed. 998, carried further the prohibition of resale price maintenance. The plaintiff in *Albrecht* was an independent distributor who had "purchased" a delivery route for the newspaper published by the defendant. The distributor began to charge his cus-

---

14. In an area not unrelated to antitrust policy—chain store regulation—Mr. Justice Brandeis once observed:

   There is a widespread belief that . . . by the control which the few have exerted through giant corporations, individual initiative and effort are being paralyzed, creative power impaired and human happiness lessened; that the true prosperity of our past came not from big business, but through the courage, the energy and the resourcefulness of small men; that only by releasing from corporate control the faculties of the unknown many, only by the opening to them of the opportunities for leadership, can confidence in our future be restored and the existing misery be overcome; and that only through participation by the many in the responsibilities and determinations of busi-

ness, can Americans secure the moral and intellectual development which is essential to the maintenance of liberty.

Louis K. Liggett Co. v. Lee, 1933, 288 U.S. 517, 580, 53 S.Ct. 481, 502, 77 L.Ed. 929, 961–62 (dissenting opinion of Brandeis, J.).

15. For commentary on the *Schwinn* decision, see Handler, The Twentieth Annual Antitrust Review—1967, 53 Va.L.Rev. 1667, 1680–89; Pollock, Alternative Distribution Methods After *Schwinn*, 63 Nw.L.Rev. 595 (1968); Note, Restrictive Distribution Arrangements After the *Schwinn* Case, 53 Corn.L.Rev. 515 (1967); Note, Territorial and Customer Restrictions: A Trend Toward A Broader Rule of Reason?, 40 Geo.Wash.L.Rev. 123 (1971). Cases decided in the wake of *Schwinn* are reviewed in Copper Liquor Co., Inc. v. Adolph Coors Co., 5 Cir. 1975, 506 F.2d 934, 940–46.

tomers higher prices than those suggested by the defendant. The defendant employed a third party to solicit the distributor's customers, and it also assigned certain of his customers to another distributor. The defendant made it clear that these measures would be discontinued if the distributor would adhere to the suggested prices. The Supreme Court held that the defendant's actions were not wholly unilateral; rather, the requirement of § 1 of the Sherman Act of a combination was met by the defendant's employment of the third party and by the agreement with the other distributor. The Court reaffirmed its holding in Kiefer-Stewart Co. v. Seagram & Sons, 1951, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219, that per se illegality attaches both to efforts to fix maximum prices and attempts to fix minimum prices. *Albrecht* is notable for its expansive construction of the term "combination": "Under *Parke, Davis* [Albrecht] could have claimed a combination between [the Herald Company] and himself, at least as of the day he unwillingly complied with [its] advertised price. Likewise, he might successfully have claimed that [the Herald Company] had combined with other carriers because the firmly enforced price policy applied to all carriers, most of whom acquiesed in it. *See* United States v. Arnold Schwinn & Co., 388 U.S. 365, 372, 87 S.Ct. 1856, 18 L.Ed.2d 1249 . . .." 390 U.S. at 149, n. 6, 88 S.Ct. at 872.

*Parke, Davis, Simpson, Albrecht, Schwinn,* and *Topco* are illustrative of the Court's increasing antipathy toward vertically imposed controls of manufacturers upon customers, territories, and prices. In fact, in *Schwinn*, the Court noted that "if there were here a finding that the restrictions were part of a scheme involving unlawful price fixing, the result would be a per se violation of the Sherman Act." 388 U.S. at 373, 87 S.Ct. at 1862. *See also* United States v. Sealy, Inc., 1964, 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238; United States v. Bausch & Lomb Optical Company, 1944, 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024.

The law regarding the degree of control a manufacturer or supplier may lawfully exercise under the antitrust laws over wholesalers and retailers with respect to prices, territories, customers, or other matters is still evolving.[16] The findings of per se illegality in *Parke, Davis, Simpson, Albrecht, Schwinn,* and *Topco* have implications extending far beyond the specific fact patterns involved in those cases. Indeed, this Circuit has relied upon the analysis in *Simpson* to pierce a complicated system that effectuated retail price maintenance in Lehrman v. Gulf Oil Corp., 5 Cir. 1972, 464 F.2d 26. In *Lehrman* we held that there was sufficient evidence for a jury to conclude that Gulf Oil's conduct toward the plaintiff in withdrawing a form of price support styled a temporary competitive advantage (TCA) constituted "an unlawful coercive effort to secure compliance with Gulf's 'suggested' retail prices." 464 F.2d at 38. Such a finding, we held, could be supported on either of two theories. First, Gulf may have conspired with the competing major oil company in the area and its local retailer to deny the plaintiff price support so that in the future he would adhere to Gulf's suggested retail prices and not engage in price competition. Second, Gulf may have withdrawn price support from the plaintiff to bring home to other Gulf retailers or to a competing major oil company in the area or to both its resolve to punish other retailers who refused to maintain the suggested retail prices and to reassure the major competitor that the level of prices thus maintained would insure a future symbiotic

---

16. For a sampling of the extensive literature this development in the law has spawned, see Keck, Alternative Distribution Techniques— Franchising, Consignment, Agency, and Licensing, 13 Antitrust Bull. 177 (1968); McLaren, Marketing Limitations on Independent Distributors and Dealers—Prices, Territories, Customers, and Handling of Competitive Products, 13 Antitrust Bull. 161 (1968); Groenke, What's New in the Antitrust Aspects of Selecting and Terminating Distributors, 13 Antitrust Bull. 131 (1968); Wade, Some Antitrust Problems in Terminating Franchises, 44 St. John's L.Rev. 23 (1969).

relationship between them at the retail level. We concluded that, although the TCA system might otherwise be regarded as ambiguous with respect to its antitrust implications, the particular exercise of the practice in question together with any anti-competitive animus that might be present, permitted an inference that the practice did, in fact, have an anticompetitive intent and effect. 464 F.2d at 38, n. 9. Thus, even though Gulf had a right to set its own wholesale prices, and arguably had a right to vary its wholesale price in response to competition on the retail level, it did not have the right to extract adherence from its retailers to a schedule of retail prices as a *quid pro quo* for charging them wholesale prices that would allow them a sufficient margin of profit to stay in business.

We now apply the authorities we have discussed to the facts of the present case. General Foods argues that it

negotiated directly with Multiple Food Service Accounts, a category of customers in the institutional food field which deals with the public through a multiplicity of food service outlets. These negotiations determine, between buyer and sellers, the prices, credit terms and other conditions of sale. These contractual arrangements of course involve the setting of the price. But this is not the price-fixing which is prohibited by the Sherman Act.

First, we note again that the character of the contract between General Foods and MFSA's and the character of the negotiations General Foods refers to are not reflected in the record of this case. Instead, the record suggests that MFSA prices are determined unilaterally by General Foods in accordance with its own system of allowances for quantity buying and other factors, rather than negotiated at the bargaining table with each MFSA. Indeed, the very definition of the term MFSA masks the character of the transactions, for it comprehends everything from large national hotel chains to any establishment having two or more separate outlets.

Moreover, the manner in which General Foods frames its argument assumes the conclusion. For example, it argues that "there can be no question of the complete propriety of agreement between a seller and his customer about price." But one of the central questions in the case is who was a customer of whom. Indeed, in *Simpson*, it was implicit in the argument in support of the validity of the consignment that retail customers were not the customers of the lessee of the individual station, but rather those of Union Oil Company itself. To lend support to this line of argument, General Foods asserts that the role of Greene in this case is that of a delivery agent who is permitted a delivery allowance on sales to MFSA's. Further, General Foods asserts, sales made to down-the-street accounts are markedly different from those made to MFSA's: there is "no nexus, no privity of contract" between General Foods and the DTS accounts, it says, whereas such a nexus or privity does exist between it and the MFSA's.

These assertions are not borne out in the record. The most we know of the relation between General Foods and the MFSA's is that the latter had a "right" to purchase certain General Foods products from General Foods at a certain discount from whatever price General Foods established in its MFSA price list. MFSA's did not bind themselves to purchase exclusively from General Foods, or, for that matter, to purchase at all from General Foods. In these circumstances, it is questionable whether the "promise" obtained from an MFSA would be sufficient to support a contract at common law. Assuming arguendo that the relation between the MFSA's and General Foods is as General Foods has depicted it, we must still reject General Foods' argument that the MFSA's

"had full opportunity to and did negotiate with General Foods on prices and terms of sale. Price-fixing is illegal precisely because it involves an agreement by one seller with another as to the price he will charge in his own

sales transactions. His competitive freedom is forfeited. The buyer's access to a free market price is foreclosed. There is no such agreement here."

■ Even if the record did support General Foods' characterization of the MFSA system, we consider that its further argument, that the access of the MFSA's to a "free market price" must be foreclosed before the price-fixing in question can be held to violate the Sherman Act, is erroneous.

■ The ban on resale price maintenance that has developed from *Dr. Miles* through *Parke, Davis, Simpson,* and *Albrecht* has in part been premised upon the belief that, when a manufacturer undertakes to distribute its goods through a chain of independent dealers, the consumers' ability to purchase at a free market price will be enhanced by the retailers' unfettered ability to set his retail price at the level he feels is most commensurate with local demand. See especially *Dr. Miles.* Moreover, the condemnation of retail price maintenance is also premised upon respect for the autonomy of independent dealers in the chain of distribution, regardless of any demonstration of increased competition with respect to the sale to ultimate consumers. *Topco.* This concern for the autonomy of independents grows in part from the view that competition at all levels of the distributive process is desirable and in part from the view that a manufacturer utilizing independent distributors and investing them with substantially all the risks of wholesale and retail distribution must also invest them with the signal prerogative of the independent businessman—the power to set his own price. *Simpson.* In the present case, there was evidence that Greene's DTS customers were charged higher prices than he would have charged had he enjoyed complete freedom to set his own price for all consumers—MFSA and DTS alike—whom he served. Even if,

as General Foods appears to contend, the legality of a retail price maintenance regime turns upon whether "the buyer's access to a free market price is foreclosed," there was evidence of such foreclosure in this case, at least with respect to the DTS accounts, for Greene testified he had to charge them higher prices.[17]

General Foods' effort to depict Greene as a mere delivery agent with respect to the MFSA's finds scant support in the record. On the contrary, it appears that Greene's sales efforts directed toward MFSA's were no different from those directed toward his DTS accounts. The record supports the inference that Greene's relation to the MFSA's was the same as his relation to the DTS accounts except—that he was forced to sell to the MFSA's at prices dictated by General Foods. General Foods' assertion that "Greene and other distributors have been free at all times to sell to any and all customers at whatever prices they choose in their own judgment," and that "they are free, indeed, to sell to the MFSA customers . . . for their own account and at whatever prices they choose," are contradicted by testimony that attempts of Greene to sell to MFSA's on his own ticket were blocked by General Foods. This was for the jury to decide.

■ General Foods contends that the "key question" in this case is "who are the parties to the contract of sale" in MFSA transactions. The teaching of such cases as *Simpson* and United States v. Masonite Corp., 1942, 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461, is that the courts in enforcing the antitrust laws must look to the effect a particular business practice has upon competition, and not to the legal form in which it is cast, in assessing its validity. This General Foods concedes, and attempts to distinguish the *Simpson* case. If anything, however, *Simpson* is a weaker case of price-fixing than the present one. For

17. Moreover, it is far from clear that the MFSA's would not benefit from increased price competition at all levels of General Food's system of distribution. General Foods implies this in its brief, but apparently relies more upon the normative power of its own argument than upon proof in the record.

in *Simpson*, Union Oil Company still held title to the gasoline, and therefore arguably had a greater claim to dictate the price to the consuming public. In the present case, General Foods makes no pretense to ownership of the goods that are ultimately sold to the MFSA's; it concedes that title to these rests in the independent distributor. It cannot be said, therefore, that General Foods has any greater warrant to dictate the price of Greene's goods to MFSA's than Union Oil Company had in *Simpson* even though it retained title.

General Foods suggests that "it would, of course, be possible to institute a series of formalities", for example, a requirement "that the distributor maintain separate inventories . . . with no title ever passed to the distributor with respect to" the MFSA's, or "alternatively, it would be possible to devise a set of documents whereby the distributor formally resells stock to General Foods before he delivers it on an MFSA order." But, it concedes, if employing these alternatives would achieve a different antitrust result, the law would turn on meaningless technicalities. We agree, but it does not necessarily follow that antitrust consequences should depend only upon who are the parties to the MFSA contract. Ending the inquiry there would be as formalistic as the alternatives deprecated by General Foods.

The present case bears a significant resemblance to United States v. Bausch & Lomb Optical Co., 1944, 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024. In *Bausch & Lomb*, the United States attacked a system of distribution whereby the manufacturer carefully selected and licensed wholesalers for its lenses and allowed them to sell only to its licensed retailers, maintaining the retail price by distributing price lists both to wholesalers and retailers, tracing the sales by a system of "protection certificates" included with the lenses, and revoking the license of any wholesaler who made unauthorized sales. The Court viewed the system as a mechanism for facilitating retail price maintenance and held it unlawful, noting that the only manner in which such a result could lawfully be achieved was under the Miller-Tydings Act. 321 U.S. at 721, 64 S.Ct. 805. In the present case, the MFSA formset is the functional equivalent of the "protection certificate" used to trace sales to unlicensed retailers in *Bausch & Lomb*. Whatever else might be said of it, the MFSA invoice formset is a device by which General Foods keeps itself informed of the volume of sales to MFSA's and the prices charged. It is perhaps the most effective means that could be devised to monitor the independent distributor's pricing to MFSA's, for payment is made directly to General Foods, with a corresponding credit to the distributor's account. And, as in the case of the wholesalers in *Bausch & Lomb*, here Greene holds undisputed title to the goods he resells. On this point, the Court noted in *Bausch & Lomb*: "Soft-Lite [one of the defendants] is the distributor of an unpatented article. It sells to its wholesalers at prices satisfactory to itself. Beyond that point it may not project its power over the prices of its wholesale customers by agreement." 321 U.S. at 721, 64 S.Ct. at 812. The same analysis applies with equal force to General Foods in the present case.

What has emerged from the record of this case is a vast system for controlling resale prices, perhaps more comprehensive than that involved in *Simpson*. Through its MFSA system, General Foods has segregated buyers of institutional food above a certain threshold in terms of annual demand and number of retail outlets. General Foods has determined prices for these buyers on the basis of its national MFSA list minus what the record suggests is a more or less standard Equal Opportunity Allowance correlated to the varying characteristics of the particular MFSA. That such a system is economically necessary or desirable to General Foods is, of course, no defense. So far as the record shows, the actual "selling"—the solicitation of orders, the moving of merchandise, most of the risk of loss, and the day-to-day task of creating and maintaining customer

satisfaction—is performed by Greene and his counterparts, and not by some central selling staff of General Foods. The only functional difference between Greene's servicing of his DTS accounts and his MFSA's is that General Foods fixes the prices for the MFSA's. It is clear that General Foods went far beyond the simple announcement of terms and refusal to deal with a non-complying independent distributor that is still permissible under *Colgate.* The MFSA invoice formset, like the "protection certificate" in *Bausch & Lomb,* was a device for policing the conduct of distributors, and there was other evidence of monitoring of Greene's pricing to his DTS customers.

■■■ There was sufficient evidence for the jury to conclude that the precipitate termination of the distributorship, shortly after assurances that General Foods would make an offer to purchase the business and after an exhaustive examination of Mr. Greene's business records and customer lists, was to punish him for failure to comply fully with the MFSA regime. In this, it was like the termination of licenses in *Bausch & Lomb,* the termination of leases in *Simpson* and *Lehrman,* and the refusals to supply retailers in *Dr. Miles, Albrecht,* and *Parke, Davis.* Here there is not even the pretense of retention of title as in the consignment cases like *Simpson.* The entire MFSA system is unabashedly calculated to affect the resale price and it is enforced by the coercive potential of summary termination and in cases involving lesser infractions, by reduction in the distributor's Growth Opportunity Allowance.[18]

■■■ We hold that General Foods' MFSA system constitutes a per se price-

fixing violation of § 1 of the Sherman Act.

## IV.

■■■ Our conclusion is not altered by the fact that in a 1956 proceeding, the Federal Trade Commission considered the MFSA system in passing and in connection with another statute. *In the Matter of General Foods Corporation,* 1956, 52 F.T.C. 798. The case involved, among other things, the question whether General Foods' MFSA system violated § 2(d) of the Clayton Act, 15 U.S.C. § 13, as amended by the Robinson-Patman Act, which provided:

> \* \* \* It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any product or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.

The Commission determined only that the delivery allowances made to independent distributors did not violate § 2(d) of the Robinson-Patman Act, because General Foods in its contracts with the distributors had bargained for such "delivery service". The opinion of the Federal Trade Commission had nothing whatever to do with the Sherman Act and the present case.[19]

---

**18.** We do not rest our holding on the possibility that General Foods reduced Mr. Greene's GOA as a coercive measure; we simply mention the possibility for the sake of completeness. *See* footnote 5 *supra* & accompanying text.

**19.** It is true that the Commission said in its opinion that the "delivery allowances" are not "payments made to the [distributor] as a customer and are not made in connection with the

resale of goods bought by him from respondent." 52 F.T.C. at 797. First, we should point out that, although the present record does not give as complete a picture of General Foods' overall system of distribution as would be necessary to make this determination with certainty, it appears possible that the validity of this ruling by the Federal Trade Commission has been undermined by the much more recent opinion by the Supreme Court in FTC v.

■ It is true, as General Foods points out, that § 5(c) of the Federal Trade Commission Act provides that "the findings of the Commission as to the facts, if supported by evidence, shall be conclusive." But the authority General Foods seeks to rely on here is a conclusion of law with respect to § 2(d) of the Robinson-Patman Act, and is not binding on this Court in consideration of the Sherman Act claim. Moreover, even if findings of fact were here involved, the passage of 19 years and the concomitant development in the law represented by *Simpson, Parke, Davis, Schwinn, Topco* and their progeny in the lower courts, the changes in the industry in question, and particularly the great growth in the use of the MFSA device since the complaint was filed in the Federal Trade Commission proceeding in 1952, would cast doubt upon the vitality of such findings.

Pleas of reliance upon this opinion of the Federal Trade Commission regarding the Robinson-Patman Act as a defense to a private treble damage action under the Sherman Act, expecially in light of the intervening passage of time and development in the law, have a peculiarly hollow and unpersuasive ring. It is true that General Foods refers in its brief to a later formal inquiry initiated by the Commission in 1967 regarding "the manner in which General Foods deals with MFSA accounts." General Foods says that "the investigation continued for a period of some 18 months and was terminated without action," and that it "was informed that the Commission had concluded that the practices investigated involved no illegality." The General Coun-

Fred Meyer, Inc., 1968, 390 U.S. 341, 88 S.Ct. 904, 19 L.Ed.2d 1222. The Court dealt with the term "customer" used in the statute, and it held that retail customers of a wholesaler were to be regarded as customers of the original seller when they competed with direct customers of the seller. Such retail customers of a wholesaler were therefore entitled to receive proportionately equal promotional assistance. In cases involving allowances or services to retailers who purchase directly from the seller, then, the *Fred Meyer* case has limited by implication the validity of the indirect purchaser doctrine. It is at least doubtful whether the FTC today would characterize the MFSA system in the same terms it used in construing § 2(d) of the Robinson-Patman Act in 1956. Moreover, consistency—or for that matter, intelligibility—has not been regarded as a hallmark by observers of the FTC's implementation of the Robinson-Patman Act. As one observer has noted, "having words meaning different things in different contexts was as familiar to antitrust lawyers as to Humpty Dumpty in *Through the Looking-Glass*. . . "Under the Robinson-Patman Act even little cans are fully competitive with big cans, but bacon and ham are not competitive. 'Pigs is pigs' only when the Commission, not the market place, says that they are." Anonymous, *Eine Kleine Juristische Schlummergeschichte*, 79 Harv.L.Rev. 921, 928–29 (1966). The author goes on to advise us that we "should always avoid the intellectual sandtrap of thinking that any language in the Patman Act will mean the same thing from case to case." *Id.* The author also intimates that it is not always an easy task to square the holdings of the FTC interpreting the Robinson-Patman Act with the more general precepts of the Sherman Act. *Id.* at 924–25.

These difficulties offer further justification for our reluctance to rely upon the 1956 opinion of the FTC. Moreover, as General Foods itself points out in its brief, "this, of course, is not a case involving a review of findings of the FTC. It is also true that Mr. Greene was not a party to the earlier proceedings and investigations of that Commission." Therefore, even if the issues in the 1956 proceeding and the present case were identical (which, as we have noted, they are not), the doctrines of res judicata and collateral estoppel would not apply. Indeed, even in a case where the issues and parties were identical to an earlier case, it has been held that intervening judicial decisions that substantially alter the state of the law might preclude the application of those doctrines to the second case. United States v. General Electric Co., S.D.N.Y.1973, 358 F.Supp. 731, 738–42. *See also* Sam Fox Publishing Co. v. United States, 1961, 366 U.S. 683, 81 S.Ct. 1309, 6 L.Ed.2d 604.

Finally, General Foods correctly notes that "under its mandate to proscribe unfair methods of competition in commerce or unfair acts or practices in commerce, the [FTC] has authority to go beyond the letter of the antitrust laws and to deal with possible anti-competitive practices in their incipiency." FTC v. Motion Picture Advertising Co., 1953, 344 U.S. 392, 73 S.Ct. 361, 97 L.Ed. 426. But it simply does not follow, as General Foods seems to imply, that the fact that the FTC fails to take action against a practice in its incipiency means that the practice, when full-blown, will not violate the antitrust laws.

sel of the Federal Trade Commission, however, has notified opposing counsel (who, in turn, has brought the correspondence to the attention of this Court) that "a review of the Commission's files indicates that the Commission has not advised General Foods Corporation as to the legality of any of its practices in connection with the distribution of its products to so-called national accounts. General Foods did not consult the Commission concerning making any such representation to the courts."

The fact that General Foods has successfully avoided censure by the Federal Trade Commission does not, in these circumstances, immunize it from challenge in a private treble damage action.

### V.

We consider, finally, whether there was sufficient evidence to prove the fact of injury attributable to the violation of the Sherman Act and whether there was adequate proof of damages.[20] As this Court noted in Copper Liquor, Inc. v. Adolph Coors Company, 5 Cir. 1975, 506 F.2d 934, 953:

> The general rules relating to antitrust damages are easy to state, but difficult to apply. It is said that, once a plaintiff in a private antitrust action has proved that the defendant violated the law and that this violation caused him injury in fact, the plaintiff is held to a less rigid standard of proof with respect to the actual dollar amount of his damages because 'economic harm is intangible and analysis of it is complex'. '[A] wrongdoer should bear the risk of uncertainty that inheres in measuring the harm he causes'. Note, Private Treble Damages for Destruction of All Or Part Of A Business, 1967, 80 Harv.L.Rev. 1566, 1572. See Bigelow v. RKO Radio Pictures, Inc., 1946, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652; Story Parchment Co. v. Patterson Parchment Paper Co., 1931,

282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544.

*See also* Kestenbaum v. Falstaff Brewing Corp., 5 Cir. 1975, 514 F.2d 690 [1975]; Terrell v. Household Goods Carriers' Bureau, 5 Cir. 1974, 494 F.2d 16, *cert. dismissed*, 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260; Hobart Bros. Co. v. Malcolm T. Gilliland, Inc., 5 Cir. 1973, 471 F.2d 894.

General Foods asserts that "the record is devoid of any showing of injury to Mr. Greene in his business or property," and that there is no showing of any causal relationship between the violation of § 1 of the Sherman Act and loss of business following the termination of Greene's distributorship.

We conclude that there was ample evidence to support a finding of injury in fact, both with respect to loss of profits attributable to Greene's enforced adherence to the MFSA pricing regime, and with respect to diminution in Greene's overall business following the termination of his distributorship. As often happens, the dispute here centers on certain assumptions and techniques of calculation utilized by the plaintiff's expert on damages. General Foods concedes that the plaintiff's witness, Dr. Ozanne, was fully qualified on the basis of his education and prior experience to testify as an expert in the area of assessing damages attributable to the sort of antitrust violation involved in this case.

This case presents what may be termed the problem of partial destruction of a going business concern. The expert made two distinct inquiries. First, he had to determine the damage, if any, inflicted upon Greene's business by reason of General Foods' system of resale price maintenance. Second, because Greene continued to engage in the distribution of institutional food products after his General Foods distributorship was terminated, the expert had to deter-

---

**20.** *See generally* Lanzillotti, Problems of Proof of Damages in Antitrust Suits, 16 Antitrust Bull. 329 (1971); Guilfoil, Damage Determination in Private Antitrust Suits, 42 Notre Dame Law. 647 (1967); Note, Private Treble Damage Antitrust Suits: Measure of Damages for Destruction of All or Part of a Business, 80 Harv. L.Rev. 1566 (1967).

mine what damage, if any, the termination worked upon Greene's business.

The expert, Dr. Ozanne, testified that the basis for his projections and opinions was an examination of a wide range of financial information relating to Greene's business. Dr. Ozanne examined Greene's federal income tax returns, financial statements prepared by accounting firms in connection with the filing of such returns, invoices issued by Greene both to the MFSA's and to his DTS accounts for a number of years prior to the termination, invoices reflecting the cost to Greene of the General Foods merchandise sold, and price lists issued by General Foods. He also scrutinized written summaries and analyses of Greene's performance prepared by the regional sales manager of General Foods. He consulted, of course, with Greene and Greene's chief salesman. He considered statistical data regarding the general economic climate in Tallahassee and the surrounding area serviced by Greene. Dr. Ozanne consulted with local bankers in the Tallahassee area as to the interest rate at which an individual similarly situated to Greene could borrow money. Indeed, he made an exhaustive investigation of the facts pertinent to the issue of damages.

In determining the damages Greene suffered prior to termination, the expert reviewed invoices and financial statements for the four-year period prior to filing suit for which damages may be recovered under the statute of limitations. He first sought to determine the net profit margin on MFSA's.[21] He calculated the profit margin as a percentage of the selling price, although he acknowledged that another method would be to calculate it as a percentage of the cost.

He indicated that the method chosen was irrelevant so long as it was applied consistently. Based upon his examination of MFSA invoices, price lists, and other financial records, he concluded that the average margin on MFSA's was approximately ten percent.

He then sought to determine the margin on the remaining accounts, which were DTS accounts. To do this, he subtracted the MFSA costs and margin from the total costs and sales as reflected in the firm's financial reports. He thereby arrived at a DTS margin of approximately 24.5 percent. He indicated that this margin comprehended both the margin enjoyed on General Foods products sold to DTS accounts, and the margin on products of other manufacturers sold to those accounts. He testified that his examination of actual DTS invoices revealed in many instances margins substantially higher than 24.5 percent, so that this figure could be regarded as a conservative estimate. He subtracted the MFSA margin from the DTS margin, leaving 14.5 percent as the additional margin Greene would have achieved had he been free to sell to MFSA's at his regular prices. He then multiplied that figure by the actual amount of coffee sold to MFSA's in the period in question, or, in the case of non-coffee products, by the number of units sold to MFSA's.

There was testimony by Greene's chief salesman that, on the basis of his experience, 90 percent of the MFSA's could be sold at regular prices on Greene's own ticket. The expert, however, made a much more conservative adjustment. Although part of the injury to competition was that DTS accounts were

21. The following equation, derived from the record and exhibits, may help clarify the discussion in the text.

Lost pre-termination profits for each year **** = [(total units MFSA coffee sold) × (DTS margin ** − MFSA margin *) + (total units MFSA non-coffee products sold) x (DTS margin ** − MFSA margin * )] × [Y *** ].

    * Derived from Mr. Greene's business records as approximately 10%.

    ** Derived by subtracting MFSA costs and margin from totals for his overall business in Mr. Greene's financial statements, which included sales of products of other manufacturers as well as sales of General Foods products. Derived as approximately 24.5%.

    *** Y is simply a multiplier derived by subtracting the fraction of profits the expert estimated would be lost each year on hypothetical sales to MFSA's at higher prices from 1. For example, for 1970, Y = 1.00 − .60 = .40.

    **** Total pre-termination profits lost is the sum of the totals derived for each year.

charged higher prices than they would otherwise have been charged, the expert did not attempt to speculate on what the DTS price structure would have been absent the illegal resale price maintenance. Instead, he made a single downward adjustment based on a number of general considerations. For each of the years in question prior to the termination of the distributorship, he subtracted a certain percentage of the profit he had determined Greene would have made had he been free to sell MFSA's at his regular prices. He termed this the profit from business lost to competition due to less competitive pricing. For the portion of 1967 in question, he subtracted 20 percent; for 1968, 30 percent; for 1969, 40 percent; and for 1970, 60 percent. The expert conceded that there was no wholly accurate manner of determining what the loss of profits would have been if all MFSA's were charged DTS prices. He based his deductions upon the competitive climate as he judged it from annual business reviews and other financial information available to him, as well as information on the general economic climate nationwide and more particularly in the Tallahassee area. Thus, for example, his deduction for 1970 rose to 60 percent, because, in general, the national economy was in a recession period, and that circumstance, coupled with indications that competing roasters of coffee were moving into the Tallahassee area about 1969, led him to conclude that the MFSA's would be much more sensitive to price differences in 1970.

First, we conclude that there was an adequate basis for the jury's finding that Greene's business did suffer injury in fact. More specifically, there was evidence that he had been able to sell MFSA's coffee on his own at his prevailing DTS prices, but was not allowed to continue this practice. Moreover, many of the MFSA's he serviced were, in terms of their annual consumption and their size, location and other characteristics of their operation, not fundamentally different from his DTS accounts; it is undisputed that he was able to sell substantial quantities of General Foods'

products and other products to DTS accounts at substantially higher profit margins. Once this permissible inference of injury in fact had been made, it was open to the jury to make a just and reasonable estimate of damages suffered before termination on the basis of the theory proffered by the expert, even though there might be alternative methods of computation that were not presented to the jury.

■ In proving damages, it has been said that occasionally "proof of losses which border on the speculative" will be permitted "in order to implement the policy of the antitrust laws". Ford Motor Co. v. Webster's Auto Sales, Inc., 1 Cir. 1966, 361 F.2d 874, 887. See also Hobart Brothers Co. v. Malcolm T. Gilliland, Inc., 5 Cir. 1973, 471 F.2d 894, 903. The record permits the conclusion that General Foods practiced resale price maintenance with respect to a certain proportion of institutional food consumers, and permits the inference that this practice caused the remaining consumers to be charged higher prices than would otherwise be the case. General Foods, therefore, cannot complain of the assumptions the expert made in his attempt to portray what market conditions would have prevailed, absent an illegal restraint, particularly where it offers no clearly superior set of assumptions that could have been applied to the available data with more accurate results. Everything in the expert's determination of lost profits before termination had a firm basis in the business records of the concern, with the exception of the deductions he made for business lost on account of less competitive pricing under his assumption that the MFSA's would have been charged the prevailing DTS prices absent the unlawful restraint. The deductions were based upon Dr. Ozanne's considerable experience with the economics of distribution and his familiarity with the general economic indicators relative to the Tallahassee area. They represented a more conservative view of what would have been possible absent the unlawful restraint than that taken by Greene's chief salesman in his

testimony based upon his long personal experience in the territory in question. We hold, therefore, that the expert's analysis of profits lost before termination may fairly be characterized as "just and reasonable estimates based upon relevant data" that our cases have held to be appropriate where, as here, the defendant's violations of the antitrust laws have obscured conditions that would have prevailed in a free marketplace and made impossible precise calculation of damages. We cannot say that the record was barren of "substantial probative facts", and must therefore uphold the jury's verdict. *See* Hobart Bros. Co. v. Malcolm T. Gilliland, Inc., 5 Cir. 1973, 471 F.2d 894, 902.

■ We turn now to the expert's analysis of Greene's lost future profits attributable to the wrongful termination of his distributorship.[22] The law is settled in this circuit that in appropriate cases loss of future profits is a proper measure of damages in a private treble damage action under the antitrust laws. *See* Lehrman v. Gulf Oil Corp., 5 Cir.

1974, 500 F.2d 659; Terrell v. Household Goods Carriers' Bureau, 5 Cir. 1974, 494 F.2d 16; Lehrman v. Gulf Oil Corp., 5 Cir. 1972, 464 F.2d 26. It has correctly been held that a plaintiff may not recover both lost future profits *and* the "going concern value" of a business destroyed by an antitrust violation, for that would permit double recovery, *see, e. g.,* Albrecht v. The Herald Co., 8 Cir. 1971, 452 F.2d 124. We do not, however, have that problem in this case, because Greene continued in business after the termination and operated profitably, although not as profitably as he alleged he would have but for the termination.

■ There was testimony that General Foods products constituted approximately 50 percent of Greene's total sales at the time of termination. Dr. Ozanne testified that many of the invoices he examined covered sales both of General Foods products and of products of other manufacturers that Greene handled. Because of the national brand recognition and customer loyalty to General Foods products, particularly Maxwell

---

**22.** The following chart, substantially similar to one the trial court admitted into evidence at trial, may help clarify the discussion in the text. The double line divides figures derived for the period before the termination of the distributorship from those derived in estimating future lost profits. The total thus derived, $163,500, was then discounted to its present value, and that amount was added to the expert's estimate for net lost pretermination profits for a grand total of $149,805.31. The jury awarded $75,000.

FUTURE NET PROFIT LOST THROUGH CANCELLATION OF GREENE'S
GENERAL FOODS DISTRIBUTORSHIP

| 1. Year | 2. Reported Net Profit | 3. Net Profit Adjusted For Other Income | 4. Net Profit Increased By MFSA Net Difference | 5. Net Profit That Should Have Been Received W/O Cancellation | 6. Net Profit Lost Through Cancellation (Col. 5–Col.3) |
|---|---|---|---|---|---|
| 1967 | $ 2,739 | $ 6,000 | $ 7,714 | | |
| 1968 | 13,976 | 10,000 | 14,216 | | |
| 1969 | 16,067 | 16,500 | 22,574 | | |
| 1970 | 14,884 | 15,500 | 21,289 | | |
| 1971 | 4,064 | 2,500 | | $22,500 | $20,000 |
| 1972 | 8,471 | 9,000 | | 24,500 | 15,500 |
| | | Projected | | | |
| 1973 | | 11,000 | | 27,000 | 16,000 |
| 1974 | | 13,000 | | 29,000 | 16,000 |
| 1975 | | 15,000 | | 31,000 | 16,000 |
| 1976 | | 16,000 | | 32,000 | 16,000 |
| 1977 | | 17,000 | | 33,000 | 16,000 |
| 1978 | | 18,000 | | 34,000 | 16,000 |
| 1979 | | 19,000 | | 35,000 | 16,000 |
| 1980 | | 20,000 | | 36,000 | 16,000 |
| | | | | | $163,500 |

House Coffee, because of the substantial share of Greene's sales that was made up of General Foods products, because of the tendency of customers to order out of the total product mix available from Greene, and based on his general knowledge of franchising and distribution, the expert concluded that the General Foods distributorship had a value to Greene's business beyond the actual margins he enjoyed on sales of specific General Foods products. He characterized General Foods products collectively as being "a major door opener" that helped Greene establish and maintain business relationships with consumers of institutional food products and permitted him to sell other kinds of institutional food products to these customers much more easily. The General Foods distributorship gave him access that he might not otherwise have to such customers. A distinct but related aspect of this case is the fact that General Foods obtained Greene's customer list shortly before termination and, after termination, began to service the major customers on the list itself. Therefore, part of the future damage sustained by Greene, it is argued, is attributable to the deprivation of the "door opener" effect coupled with General Foods' outright commandeering of accounts previously serviced by Greene, to which he presumably could have sold products of other manufacturers. There was nothing in the distributorship contract to prevent Greene from dealing in the products of other manufacturers, and General Foods was well aware that he did so. Though admittedly difficult to quantify, we think there was sufficient evidence to permit the jury to conclude that some sort of "door opener" effect did exist with respect to the General Foods distributorship and loss of this effect may be taken into account in estimating lost future profits. On the other hand, the business records show that the volume of General Foods coffee sold by Greene had declined in the years preceding the termination by roughly one third from 1964 through 1970. General Foods argues that this rate of decline must also be projected into the future, something that the ex-

pert did not explicitly work into his set of assumptions. Whatever merit this contention has in its own right is necessarily diminished by the inferred "door opener" effect, as well as the fact that other General Foods products, for example, Jell-o, were distributed by Greene and contributed to the "door opener" effect as well as the coffee.

■ The expert necessarily based his projection of future lost profits upon his determination of what Greene had lost in the past because of the difference between the profit margin a free market would have afforded and the margin he obtained under the MFSA system. Initially we should note that the record reveals a decline in gross sales in the fiscal year following termination of some $207,000 as compared to the gross sales the year preceding termination. That fact in itself is a strong indication that at least some future profits were lost. But the expert did not rely upon that decline. Instead, he based his estimate on trends established in the years preceding the termination, giving more emphasis, he testified, to the more recent years. Making such a projection in the present case is more likely to yield accurate results than in cases like *Lehrman,* because here the plaintiff had been in business for 19 years prior to the termination, whereas in *Lehrman* the plaintiff had operated for a shorter period of time and therefore had a less reliable "track record".

The expert of course had available to him the actual reported net profit from financial reports and income tax returns for the years 1967 through 1972. He adjusted these actual figures to eliminate the distorting effect of certain write-offs of bad debts and certain profits made on sales of capital assets at prices above their depreciated value for federal income tax purposes. This yielded an adjusted net profit figure. For the two years after termination the figure reflected the loss of the General Foods distributorship. His adjusted net profit for 1972 was $9,000. He projected a $2,000 increment for 1973, a $2,000 increment for 1974, and $1,000 increments for the remaining years through 1980.

For the four-year period prior to termination, he was able to derive a net profit figure he supposed should have been received but for the unlawful restraint. He did this by adding to the adjusted net profit the net profit lost on account of the MFSA system, which he had derived by the method we have already discussed. He projected this series of figures, which he termed "net profit increased by MFSA net difference", through 1980 with increments proportional to those added to projected net profit after termination. By subtracting the latter from the former, he arrived at a series of figures for 1971 through 1980 representing estimated net profit lost because of the termination of the distributorship. To determine the total loss to Greene's business attributable to the antitrust violations, he simply totalled the net lost profit figures he had derived for the period prior to termination, and added to that the total of future lost profits adjusted to its present value.

The evidence as to the reason for termination of Greene's distributorship is conflicting. There was, however, sufficient evidence to permit the jury to conclude that it was terminated because Greene was not adhering to the MFSA system. The jury so concluded. Moreover, there was sufficient evidence for the jury to conclude that Greene's business had been injured in fact because of the termination, if only in that his gross sales immediately declined by some $207,000 in the next fiscal year.

Once the antitrust violation and its causal relation to the plaintiff's injury have been established, the cases in this circuit permit some latitude in the jury's determination of the quantum of damage. Loss of future profits, in the circumstances of this case, was an appropriate measure of damages, and, applying to the expert's method the same legal test we have already applied to his method of determining pre-termination damages, we cannot say that it goes beyond the sphere of just and reasonable estimates, though necessarily imprecise, based upon relevant data. General Foods has not sought to demonstrate any

better method for determining lost future profits that could have been applied to the available data in this case.

General Foods argues that the damage expert's entire analysis of lost profits was inadmissible "because of its utter lack of any factual foundation." This contention is lacking in merit. General Foods also contends that the expert should have made an explicit assumption that the rate of decline in sales of General Foods coffee would have continued into the future. The expert did not make such an explicit assumption. Neither, however, did he "turn this trend around" in his future projections. Although they reflected some increase, presumably more in keeping with the current rate of inflation than anything else, they clearly do not reverse the trend, as General Foods asserts. Moreover, there was evidence that, despite the decline in volume of sales of General Foods coffee, Greene's overall business was growing. This, together with the expert's opinion that the General Foods coffee served as a "door opener" and increased the sales of other products he handled, might have balanced out the downward trend in the actual volume of General Foods coffee sales, or so the jury might conclude. In any event, because the decline in volume was forcefully brought home to the jury in the cross-examination of the expert with respect to this aspect of his calculations, and the jury was therefore well aware that he had made no specific assumption regarding the decline in his projections, we cannot hold that the evidence does not, in Wigmore's terms, "rise to a clearly sufficient degree of value" . . . "something more than a minimum of probative value", so as to require the trial judge to exclude it from the jury's consideration altogether. 1 Wigmore on Evidence (3rd ed. 1940) at 409–10.

We are mindful of the special difficulties that can arise when the plaintiff in a private treble damage action, attempting to prove the quantum of damages he has suffered, resorts, in Judge Friendly's phrase, "to an array of figures conveying a delusive impression of exactness in an

area where a jury's common sense is less available than usual to protect it." Herman Schwabe, Inc. v. United Shoe Machinery Corp., 2 Cir. 1962, 297 F.2d 906, 912. Yet here the "delusive impression of exactness" was dissipated by skillful cross-examination that brought out the alleged deficiencies in the method of computation. Significantly, the jury awarded damages of only half the expert's total estimate of approximately $150,000. We cannot say that the probative value of the expert's proffered analysis of lost future profits was so slight that it should not have been submitted to the jury.[23]

Finally, General Foods argues that "[the expert] candidly admitted that his theory was that the real value of a Maxwell House distributorship was the use of the Maxwell House name as a drawing card so that Mr. Greene could switch General Foods buyers to *other* coffees—a direct violation of the terms of Greene's contract and the immediate cause for his termination." We have noted that there was sufficient evidence for a jury finding that the termination was effected because Greene did not adhere to the MFSA system. Moreover, the expert did not assert that the *only* value of the distributorship was the "door opener" effect he described, nor did the jury, which received a specific charge on the question, accept General Foods' theory that Greene was attempting to sell the products of other manufacturers in place of (rather than in addition to) General Foods products that he had available in his warehouse. Finally, there was nothing in the General Foods distributorship contract to prevent Greene from also dealing in the products of other manufacturers.

\* \* \*

The judgment of the district court must therefore be affirmed in all respects.

Affirmed.

23. We add a cautionary note. In holding that the jury's verdict had sufficient support in the evidence and particularly in the expert's testimony, we do not imply that the expert's assumptions and methodology were the only permissible ones or even the preferable ones in determining damages in a case of this nature.